UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEATHER O'CONNOR,

       Plaintiff,                                          Hon. Sally J. Berens

v.                                                          Case No. 1:20-cv-210

SAM CRONKHITE, et al.,

       Defendants.
_____/

**OPINION**

Plaintiff Heather O'Connor has sued Defendants Sam Cronkhite, Michael Long, and the City Commission for the City of Manton (City) pursuant to 42 U.S.C. § 1983 alleging that Defendants violated her constitutional rights during the course of her campaign for the office of mayor and immediately thereafter. In particular, O'Connor alleges that Long and Cronkhite retaliated against her for exercising her First Amendment rights and discriminated against her on the basis of her sex in violation of the Fourteenth Amendment. She further alleges that the City is liable for these violations pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Now before the Court is Defendants' Motion for Summary Judgment.[1] (ECF No. 21.) For the following reasons, the Court will grant the motion and dismiss O'Connor's complaint with prejudice.[2]

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the Court conduct all further proceedings in this case, including entry of judgment.

[2] Although Defendants have requested oral argument, the Court finds that oral argument is unnecessary as the parties' briefs adequately develop the issues in contention.

## I.  Background

O'Connor is a resident and business owner in the City of Manton. She also owns a rental property in the City. (ECF No. 21-1 at PageID.134.) Defendant Cronkhite also resides in and owns a business in or around the City. During 2019 he was also a City Commissioner. (*Id.*; ECF No. 21-4 at PageID.182.) O'Connor and Cronkhite were acquainted with each other through their memberships in the Manton Chamber of Commerce. (ECF No. 21-1 at PageID.137.) Long was the City's Chief of Police and the only officer in its one-person department. (ECF No. 21-3 at PageID.176.)

In 2019, O'Connor and Cronkhite both ran for the office of mayor. O'Connor announced her candidacy in April 2019. (ECF No. 21-1 at PageID.137.) O'Connor claims that after announcing her candidacy against Cronkhite, Cronkhite and Long harassed and intimidated her.

### A.  Defendant Long

O'Connor claims that Long harassed or retaliated against her by refusing to provide her police services. She identifies four instances in her complaint.

First, in June 2019, she hired a surveyor to determine the boundary line between her rental property and a neighboring business, Master Auto, for the purpose of erecting a fence. (*Id.* at PageID.138.) O'Connor and her tenant, Lesley Boyer watched as the surveyor marked off points. As the surveyor worked, employees from Master Auto verbally harassed him and told him he had no business being on Master Auto's property. (*Id.*) The surveyor was able to complete his work without incident. Nonetheless, O'Connor reported the incident to the City at the June 27, 2019 City Commission meeting. In response, the mayor told O'Connor that he would instruct Long to investigate the incident and follow up with O'Connor. However, she claims that no one from the City ever contacted her. (*Id.* at PageID.138–39.) Long states that he was never informed of the

incident, and thus, could not have investigated it. He further states that the surveyor never made a complaint. (ECF No. 21-3 at PageID.177.)

Second, in July 2019, O'Connor's tenant, Boyer, made a noise complaint to Long through the City's website. (ECF No. 21-1 at PageID.139.) O'Connor was not present at the rental property during the incident. Long responded to the complaint several days later, and O'Connor believes that it was resolved. (*Id.* at PageID.140.) Long confirms that he followed up on the complaint and the matter was resolved. He did not discuss the matter with O'Connor because she was not the complainant. (ECF No. 21-3 at PageID.177.)

Next, O'Connor's friend, Troy Jones (who was also a City Commissioner), notified her that someone at the bank saw a suspicious man "creeping" around the fence line at her residence on the morning of September 5, 2019. The man had a white truck, and he was measuring a campaign sign that O'Connor had hung on her fence. (ECF No. 21-2 at PageID.142–43.) O'Connor did not see the person herself, but only had the information from the bank employee that Jones had relayed to her. She waited until the following day to report the incident to Long. (*Id.* at PageID.143.) O'Connor asked Long to "check it out" and wanted a police report for the incident, but Long told her that it was "no big deal" and likened the incident to the feral cat issue that citizens had been raising at City Commission meetings that was not worth reporting. (*Id.* at PageID.144.) Long states that when O'Connor reported the incident, she had no information to identify "the creeper"—not a description of the person or the vehicle. In other words, there was nothing to investigate. (ECF No. 21-3 at pageID.178–79.)

Finally, on September 30, 2019, a City resident submitted a blight complaint against O'Connor's property at 508 N. Michigan stating that there was a mattress in the back yard. (ECF No. 21-1 at PageID.147.) Contrary to the report, there was nothing in her backyard. O'Connor

asked Long to correct the report. Long responded, "It's no big deal. Must be South Michigan." (*Id.*) Like O'Connor's house at 508 N. Michigan, the house at 508 S. Michigan was white with a green metal roof. Long did not correct the report, and O'Connor was never charged with a misdemeanor or an ordinance infraction because of the blight report. O'Connor does not know who at the City was responsible for correcting the report. (*Id.*)

      **B.**      **Defendant Cronkhite**

On August 20, 2019, a meet-and-greet for the mayoral candidates was held at the Manton VFW. While O'Connor was seated at a table at the front of the room, Cronkhite walked up behind her, "clapped" her on the shoulders, and said "Hey, how you doing?" (*Id.* at PageID.141.) The touching was brief ("would have been seconds, if seconds"). (*Id.* at PageID.142.) O'Connor described it as a "surprise." She told Cronkhite, "Not a good idea," and "Not a good idea for somebody (O'Connor) who has been overseas for 10 years in a war zone." (*Id.*) Although Cronkhite had walked away, he said "I'm sorry, I'm sorry." (*Id.* at PageID.141.) O'Connor did not report the incident at that time. (*Id.* at PageID.142.)

On September 17, 2018, O'Connor attended the City Commission meeting at the VFW. As she sat at a table facing the front of the room, Cronkhite approached her from behind and touched her on the right shoulder towards the neck. Although the touch happened "quickly," O'Connor said it was "unwanted, unwarranted, and it startled [her]." (*Id.* at PageID.146.) O'Connor said, "Don't," but Cronkhite did not hear the comment and did not respond. (*Id.* at PageID.147; ECF No. 21-4 at PageID.183.) O'Connor did not report the incident at that time. (*Id.*)

O'Connor attended the next City Commission meeting on October 15, 2019. As O'Connor was seated at a table, Cronkhite approached her from behind and touched her right shoulder as he greeted her. (ECF No. 21-1 at PageID.148.) O'Connor said, "No touching," but Cronkhite did not hear her. (*Id.*; ECF No. 21-4 at 183.) This was the last time Cronkhite touched O'Connor. She

4

reported this incident to her friend, Troy Jones, who was also a City Commissioner. (ECF No. 21-1 at PageID.149.) There is no admissible evidence in the record that Jones informed the mayor or anyone else from the City about the incident.

### C. Post-Election Events

Cronkhite won the November 2019 election. (*Id.* at PageID.151.) On November 22, 2019, after Cronkhite was sworn in, O'Connor filed a formal complaint with the City, in which she complained about the three instances of touching by Cronkhite, campaign improprieties and favoritism toward Cronkhite, and Long's refusal to document the September 5, 2019 "trespass" on her property. (ECF No. 21-5.) O'Connor's complaint was referred to the city attorney for an investigation. (ECF No. 21-4 at PageID.183.)

On December 17, 2019, the City Commission conducted its regular meeting. One of the issues on the agenda was an allegation of sexual misconduct against City Commissioner Troy Jones. Cronkhite had suspended Jones in light of the allegation. (ECF No. 21-8 at PageID.200.) O'Connor attended the meeting with her husband, intending to speak during the public comment segment of the meeting. (ECF No. 21-1 at PageID.153.) O'Connor also invited a newspaper reporter to attend the meeting. (*Id.*) During the meeting, Long, who was also in attendance and wearing his uniform, made eye contact with O'Connor and "beckoned" her into the hallway by first pointing at her and then to then hallway door. (*Id.*) Long did not know that O'Connor was planning on making a statement during the public comment portion of the meeting. (ECF No. 21-3 at PageID.179.) O'Connor and her husband followed Long into the hallway, where Long told O'Connor, "It's probably not a good idea for you to be here. It's like a no-contact order." "Like the kind that would be signed by a judge." (ECF No. 21-1 at PageID.154.) Although there was no "no-contact" order in place, Long's thinking was that since O'Connor had made a harassment complaint against Cronkhite, she was putting herself into a "harmful situation" by attending a

5

meeting where she was in close proximity with the alleged harasser, Cronkhite. (ECF No. 21-3 at PageID.178.) Long did not raise his voice, use physical force, or order O'Connor or her husband to leave the premises. (ECF No. 21-1 at PageID.154–55.) In fact, O'Connor "shushed" Long (ECF No. 21-3 at PageID.179), and told Long that she had a prepared statement to make during the meetin,g and a reporter was present to cover it. (ECF No. 1 at PageID.8.) All three returned to the meeting, and O'Connor presented her statement as she had planned. (ECF No. 21-8 at PageID.227–29.)

On January 2, 2020, O'Connor made a second formal complaint to the City reiterating her prior claims and adding a complaint about the December 19, 2019 hallway exchange with Long. (ECF No. 21-9.) On January 23, 2020, after completing his investigation, the city attorney issued a report summarizing his investigation. (ECF No. 21-10.) The report found no support for O'Connor's allegations and recommended no further action by the City. (*Id.* at PageID.243.)

## II. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th

Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).[3]

### III.   Discussion

#### A.   Qualified Immunity

Defendants Long and Cronkhite assert the defense of qualified immunity as to both of O'Connor's claims. The doctrine of qualified immunity provides that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). An "objective legal reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The qualified immunity inquiry requires a court to decide whether the facts as alleged or shown make out a constitutional violation and whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either prong of the inquiry without regard to sequence. *Id.* at 236. Here, the claims may be decided under the first prong of the analysis.

To prove her claims under 42 U.S.C. § 1983, O'Connor must show (1) that she has been deprived of a right "secured by the Constitution and the laws" of the United States and (2) that the

---

[3] Defendants cite *Scott v. Harris*, 550 U.S. 372 (2007), in the standard of review portion of their brief. *Scott*, which involved a videotape of the incident in question—a car chase—is inapplicable here as there is no evidence before the Court that is comparable to a videotape.

deprivation of that right was caused by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

### 1.     First Amendment Retaliation

To establish a First Amendment retaliation claim, a plaintiff must allege: (1) that she engaged in constitutionally protected conduct; (2) the defendant took an adverse action that would likely deter a person of ordinary firmness from continuing to engage in the protected conduct; and (3) the adverse action was motivated, at least in part, by the plaintiff's protected conduct. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

#### a.     Protected Conduct

O'Connor contends that she engaged in protected conduct by "running for political office," making post-election complaints about Cronkhite's sexual harassment and campaign improprieties, and attending City Commission meetings. (ECF No. 24 at PageID.288.) Defendants do not dispute that O'Connor engaged in protected activities.[4]  (ECF No. 21 at PageID.103.).

---

[4] The Court notes that in *Carver v. Dennis*, 104 F.3d 847 (6th Cir. 1997), the Sixth Circuit held that in the context of public employment, there is no constitutionally protected right to run for office. The plaintiff in *Carver*, a deputy clerk, alleged that the clerk violated her First Amendment rights by terminating her employment after she announced that she was running against her boss for the county clerk position. The court noted that, while the Supreme Court had recognized that First Amendment rights include freedom of speech and association, it had "never recognized a fundamental right to express one's political views through candidacy." *Id.* at 850–51 (citing *Grosjean v. American Press Co.*, 297 U.S. 233, 243 (1936), and *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 544 (1963)). However, the court was careful to distinguish between a discharge based on candidacy, which does not implicate First Amendment protections, from discharge based on an employee's exercise of his or her right to speak on matters of public concern, which is conduct protected by the First Amendment. *Id.* at 852. The Sixth Circuit continues to apply *Carver* in the public employment context when the termination is based solely on a rival candidacy. *See Greenwell v. Parsley*, 541 F.3d 401 (6th Cir. 2008). The Court has not found a Sixth Circuit case extending *Carver* to situations in which the plaintiff was not a public employee.

8

### b. Adverse Action

In the context of First Amendment retaliation, an adverse action is "one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999) (en banc) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). To be actionable, the effect on the plaintiff's speech "need not be great." *Id.* at 397 (quoting *Bart*, 677 F.2d at 625. However, the Sixth Circuit has observed that "since § 1983 is a tort statute, we must be careful to ensure that real injury is involved, lest we 'trivialize the First Amendment' by sanctioning a retaliation claim even if it is unlikely that the exercise of First Amendment rights was actually deterred." *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005) (quoting *Thaddeus–X,* 175 F.3d at 394) (en banc). This is simply a recognition of the broader rule that "de minimis injuries do not support a constitutional violation, even if intentionally inflicted." *United States v. Budd*, 496 F.3d 517, 530 (6th Cir. 2007); *see also Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (noting that allowing plaintiffs to bring retaliation claims for "*any* adverse action no matter how minor" would "trivialize" the First Amendment). Although the standard is an "objective" one, "the definition of adverse action is not static across contexts." *Thaddeus-X*, 175 F.3d at 398. For example, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Id.*

Citing *Mezibov v. Allen*, 411 F.3d 712 (6th Cir. 2005), and *Mattox v. City of Forest Park*, 183 F.3d 515 (6th Cir. 1999), Defendants contend that the proper inquiry in this case is whether their alleged conduct would deter a political candidate of ordinary firmness from campaigning or continuing to participate in City Commission meetings. The plaintiff in *Mezibov*, an attorney who served as a criminal defense attorney in a highly-publicized case, alleged that the prosecutor made

9

post-trial defamatory statements about his handling of the defense in retaliation for his exercise of his First Amendment right to file motions and raise legitimate arguments on behalf of his client. 411 F.3d at 715. Although the court concluded that the plaintiff's conduct of filing motions and advocating for his client were not First Amendment activities, *id.* at 720–21, it went on to examine the adverse action requirement. The court noted that, because it was required to tailor its adverse action inquiry to the circumstances of the specific retaliation claim, the proper inquiry was "whether the alleged defamation would deter a criminal defense attorney of ordinary firmness from continuing to file motions and vigorously defend his client." *Id.* at 721. *Mattox*, which *Mezibov* cited, involved retaliation claims by Mattox, an elected city council member, and Holly, a former fire fighter, arising out of an investigation of the fire department and a resultant public report. The plaintiffs claimed that comments in the report were intended to punish them for initiating the investigation. Regarding Mattox, the court observed that, as an elected official, she had voluntarily subjected herself to criticism of her actions and views on political matters, and the statements in the report were not sufficiently adverse to deter a public official from exercising her right to speak under the First Amendment. The court noted that "[p]ublic officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views." *Mezibov*, 183 F.3d at 522. As for Holly, who alleged her private information was disclosed in the report, the court found it "a close question" whether the revelations were made to punish her. *Id.* Nonetheless, the court held that she failed to allege sufficient injury to state a claim because she offered "only generalized statements" of harm to her character and reputation without any concrete personal injury. *Id.* at 522–23.

O'Connor responds that *Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010), provides the appropriate reference for this case. The plaintiff in *Fritz*, an insurance agent,

10

alleged that the defendants retaliated against her for criticizing them at public meetings and in the press by pressuring her employer to terminate its relationship with her and denying her requests for zoning and signage variances. In discussing the adverse action element, the court cited the standard from *Thaddeus-X* and observed that the analysis "must be tailored to the circumstances." The court said that because the plaintiff was "not a public employee, official, or prisoner," the level of injury she must show would be lower than that for a prisoner or public employee. *Id.* at 724. It determined that the "appropriate formulation *for these circumstances* is whether the [alleged] actions . . . would be sufficient to deter an average citizen from participating in public meetings and criticizing local officials about matters directly relevant to the citizen's business interests in the community." *Id.* (italics added). O'Connor contends that the same formulation applies here, as she was a private citizen and not a public employee or official subject to a higher standard.

O'Connor's argument that *Fritz* abrogated *Mezibov* lacks merit, as nothing in *Fritz* or any other Sixth Circuit case suggests that *Fritz* abrogated *Mezibov* in any respect. Nor does *Fritz* hold that the adverse action inquiry is limited to three possible circumstances or levels of injury: prisoners, public employees/officials, and private individuals. In fact, *Fritz* affirmed *Mezibov*'s recognition that the adverse action element "must be tailored to the circumstances." *Id.* While the plaintiff in *Mezibov* was also a private citizen, his claim arose solely from his activity as defense counsel in a criminal case. Thus, the inquiry was appropriately tailored to "a criminal defense attorney of ordinary firmness." *Mezibov*, 411 F.3d at 721; *see also Seay v. Rowland*, No. 1:16-cv-68, 2018 WL 6174692, at *8 (M.D. Tenn. Aug. 30, 2018), *report and recommendation adopted*, 2018 WL 5095456 (M.D. Tenn. Oct. 19, 2018) (asking whether the defendant's actions "would deter a protestor and licensed attorney of ordinary firmness from continuing videoing and

exercising his First Amendment rights"). Similarly, O'Connor alleges that Defendants retaliated against her because of her decision to run against Cronkhite. (ECF No. 1 at PageID.3.) In fact, the overriding theme of her case is that Long and Cronkhite engaged in the actions alleged in the complaint solely because of her candidacy against Cronkhite. Thus, the proper inquiry in this case is whether Defendants' conduct would deter a political candidate of ordinary firmness from campaigning or continuing to participate in City Commission meetings.[5]

### i.   Defendant Long

O'Connor fails to demonstrate that Long subjected her to any action that would deter a political candidate of ordinary firmness from campaigning or participating in City Commission meetings. At best, Long's alleged actions were "'inconsequential,' resulting in nothing more than a 'de minimis injury.'" *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012) (citation omitted). First, O'Connor offers no evidence to refute Long's assertions that he was never told about the survey/Master Auto incident and that he in fact responded to O'Connor's tenant's noise complaint. She thus lacks a factual basis to assert that those incidents constituted adverse action. The two remaining incidents that comprise the alleged failure to provide police services are of such nature that they would not deter *any person* of ordinary firmness from doing anything. Long's refusal to spend his time preparing a police report concerning an incident about which O'Connor had no helpful details and which likely did not even constitute a crime (measuring a campaign sign hanging on O'Connor's fence) was certainly reasonable. Similarly, Long's refusal to correct the erroneous blight report—submitted by someone other than Long—was a trivial matter. O'Connor admits she suffered no consequence from the report, and she does not even know if Long was the

---

[5] The issue of the appropriate formulation is largely immaterial in this case, as Defendants' actions were so trivial that they would not deter even an ordinary citizen from exercising her First Amendment rights.

City official responsible for correcting it. As the court noted in *Wurzelbacher*, which involved several improper database searches concerning the plaintiff without his knowledge that did not result in public disclosure of information about him:

> Wurzelbacher did not suffer a threat to his economic livelihood, was not defamed, did not endure a search or seizure of property, and did not experience the public disclosure of intimate or embarrassing information. In addition, Wurzelbacher was not threatened with a continuing governmental investigation, and he does not allege that defendants' actions in fact caused a "chill" of his First Amendment rights.

*Id.* (internal citations omitted). The same is true here. Although O'Connor alleges "[l]oss of prestige and business opportunities" in her complaint, she presents no evidence showing that Long's actions actually caused such loss. Similarly, the generalized harms of "[h]umiliation, outrage, anger, and frustration" (ECF No. 1 at PageID.12), she alleges are "too minimal be constitutionally cognizable." *Mezibov*, 411 F.3d at 722.

The exchange that O'Connor and her husband had with Long at the December 19, 2019 meeting also falls short of adverse action. The situation here is analogous to that in *Seay*, *supra*, in which the plaintiff sought to videotape events at a horse show to protest animal cruelty. During the event, an organizer had asked the defendant sheriff to notify the plaintiff and his associates that the copyrights to the show had been purchased. The defendant advised the plaintiff of this fact, asked him to stop recording, and told him that any reproduction of the video recording could result in a civil suit and possible criminal liability. The plaintiff responded that he welcomed a civil suit, but that was not the defendant's responsibility. He continued to record the event that day and returned to the event the following days and recorded without incident. The court found that the defendant's actions did not amount to adverse action, noting that the defendant did not arrest, or threaten to arrest, or cite anyone for videoing the event and did not display his handcuffs. *Seay*, 2018 WL 6174692, at *7–8. The court further observed that the plaintiff's continued exercise of his First Amendment rights in the face of the defendant's actions bolstered its conclusion. *Id.* at

*8 (citing *Wurzelbacher*, 675 F.3d at 585). In this case, Long did not order O'Connor and her husband to the hallway, but merely "beckoned" them, and they followed. Once in the hallway, Long did not raise his voice, use physical force, threaten arrest, or order O'Connor and her husband to leave the premises. Admittedly, Long's reference to a "no contact order" was a bit odd, but nothing indicates that his actions had a chilling effect on O'Connor's exercise of her rights. In fact, she "shushed" Long, returned to the meeting, and gave her prepared statement just as she had planned. While "actual deterrence on the part of the plaintiff is not necessary to state a claim of an adverse action," *Fritz*, 592 F.3d at 728, the fact that a plaintiff "was not deterred or chilled in the exercise of h[er] First Amendment rights" can bolster a conclusion that conduct does not amount to adverse action. *Wurzelbacher*, 675 F.3d at 585. Moreover, although Long was a public official, he had his own First Amendment right to express his views on a matter of public concern—that having accused Cronkhite of sexual harassment, O'Connor might be acting against her own interest by attending a meeting at which the harasser was present. *See Cook v. Greenleaf Twp.*, No. 16-cv-14060, 2018 WL 2219642, at *5 (E.D. Mich. May 15, 2018) ("A public official expressing his views on a particular incident is not grounds for a First Amendment retaliation claim."). Long did not violate O'Connor's First Amendment rights.

Accordingly, O'Connor's claim against Long fails on the adverse action element.

### ii.     **Defendant Cronkhite**

Defendant Cronkhite's alleged retaliation consisted of three brief touches of O'Connor's shoulder area as he greeted her at three separate events during the months prior to the election. As an initial matter, while Cronkhite was a City Commissioner during the campaign, the August 20, 2019 meet-and-greet was a campaign event, which Cronkhite attended as a mayoral candidate and not as a City Commissioner. "Section 1983 is generally not implicated unless a state actor's

conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) (citing *West v. Atkins*, 487 U.S. 42, 49–50 (1988)). As Defendants note, Cronkhite was a private individual at the candidate meet-and-greet rather than a state actor, and his conduct toward O'Connor that evening cannot subject him to liability under Section 1983. O'Connor does not respond to Defendants' argument on this issue, and therefore has waived any argument to the contrary. *See Akaazua v. Walker Novak Legal Grp., LLC*, No. 19-2183, 2021 WL 4097500, at *1 (6th Cir. Jan. 8, 2021) ("The district court did not err in granting the motions to dismiss filed by Imperial Valley Properties and MERS because Akaazua's failure to respond constituted a waiver of any argument that the dismissal was improper.").

In any event, the act of briefly touching a person on the shoulder for "seconds, if seconds," (ECF No. 21-1 at PageID.142), as part of a greeting is, at most, a de minimis act that involves no real First Amendment injury. To begin, O'Connor blatantly mischaracterizes her own testimony in suggesting that Cronkhite touched her in a sexual way or caressed the nape of her neck. (ECF No. 24 at PageID.284.) There is no such evidence in the record. In contrast to the argument in her brief, the conduct O'Connor described in her deposition was indeed "unlike touching a woman's breasts or buttocks." (*Id.*) It was not even close. It was not "digital stimulation . . . during romantic congress" (*id.* at PageID.283), or "romantic play" (*id.* at PageID.284), as O'Connor contends. While touching someone outside of one's close relations on the arm or shoulder as part of a greeting might be ill-advised in today's social climate, it would not deter a person of ordinary firmness, particularly an opposing candidate in an election, from engaging in First Amendment activity.

15

Therefore, like her claim against Long, O'Connor's retaliation claim against Cronkhite also fails on the adverse action element.

**Fourteenth Amendment Claim**

In Count 2, O'Connor alleges a claim of discrimination based on sex in violation of the Fourteenth Amendment. Although she asserts the claim against all Defendants, her response confirms that it is only against Cronkhite (and the City under *Monell*) and is based only on a theory of sexual harassment and not sex discrimination. (ECF No. 24 at pageID.282–86.)

A claim of sexual harassment under the equal protection clause of the Fourteenth Amendment requires a plaintiff to establish essentially the same elements as a claim for hostile work environment discrimination under Title VII. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (noting that the showing required to prevail on a disparate treatment claim under Title VII "mirrors that which must be made to recover on an equal protection claim under section 1983"). To state a claim for hostile work environment discrimination under Title VII, a plaintiff must allege that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). In a claim under Section 1983, the fifth element is applicable against a municipality only if "the harassment was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009).

It is undisputed that O'Connor satisfies the first element, and she testified that Cronkhite's putting his hand on her shoulder from behind was an "unwanted and unwarranted touching." (ECF No. 142 at PageID.142.) Her claim fails, however, on the third and fourth elements.

16

### a.     Harassment Based on Sex

Title VII prohibits harassment based on sex that creates a hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Before a court inquires "as to whether the degree of 'harassment' was sufficient to violate Title VII, it is important to determine whether there was any discriminatory 'harassment' in the first place." *Schramm v. Slater*, 105 F. App'x 34, 39 (6th Cir. 2004). The Supreme Court has noted that "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Rather, Title VII pertains only to harassment based on a protected status, such as sex or race. *Id.* Thus, "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected status]." *Wasek v. Arrow Energy Servs., Inc.,* 682 F.3d 463, 467 (6th Cir. 2012). "[U]nequal treatment . . . *that would not occur but for the* [*plaintiff's*] *gender* may, if sufficiently severe or pervasive . . . , constitute a hostile environment in violation of Title VII." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (italics in original).

O'Connor fails to present any evidence that Cronkhite touched her on the shoulder area because of her sex. She cites no evidence that Cronkhite made a degrading comment, or any comment, in connection with the instances of touching suggesting that he acted solely because she was female. She does not put forth evidence of sex-based animus or desire, nor does she present evidence that Cronkhite treated her differently than a similarly situated male. In fact, O'Connor admitted that she has seen Cronkhite "clap a male on the shoulder," just as she admitted Cronkhite did to her. (ECF No. 21-1 at PageID.140–41.) O'Connor also found the touching inappropriate not because she was female, but because she had spent ten years overseas as a government contractor "in a war zone." (*Id.* at PageID.142.) In her response, O'Connor asserts that Cronkhite put his

17

hands on her "in a familiar, inappropriate way" to assert "physical dominance" over her to undermine her effort to present herself "as a viable competitor for a leadership role." (ECF No. 24 at PageID.285.) But this assertion, unsupported by any evidence, is nothing more than counsel's argument that cannot create a genuine issue of material fact. *See Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence."). The undisputed facts are that Cronkhite greeted O'Connor in this non-threatening manner simply because she happened to be the opposing candidate. And even if, as O'Connor speculates, Cronkhite intended to dominate her to show that she was not a viable competitor, O'Connor still fails to show that her sex—as opposed to her competing candidacy—motivated Cronkhite's actions. Thus, O'Connor fails to create an inference that Cronkhite harassed her because of her sex.

### b. Severe or Pervasive Harassment

A hostile environment exists if it "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to . . . create an abusive . . . environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). In *Harris*, the Court observed:

> mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* at 21-22 (internal citations omitted). A court must consider the totality of the circumstances in determining whether an environment is "hostile" or "abusive," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance." *Id.* at 23. "A mere unfriendly work environment is insufficient to establish

18

liability." *Mast v. IMCO Recycling of Ohio, Inc.*, 58 F. App'x 116, 118 (6th Cir. 2003). Sixth Circuit cases set "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Hunter v. General Motors LLC*, 807 F. App'x 540, 545 (6th Cir. 2020) (internal quotation marks omitted).

O'Connor's evidence falls short of establishing an objectively hostile environment. As noted above, Cronkhite touched O'Connor's shoulder only twice while acting in his role as a City Commissioner. But even if all three incidents are considered, they are insufficient to create a hostile or abusive environment. First, there is no evidence that Cronkhite ever referred to O'Connor's sex or made any offensive statements (of a sexual nature or otherwise) in front of O'Connor. Second, the three touching incidents, lasting no more than seconds, were not severe; they were brief, and Cronkhite touched O'Connor only while greeting her. Moreover, from an objective viewpoint, they were not threatening, humiliating, or offensive. The totality of the circumstances would not permit a jury to find that Cronkhite's actions created an objectively hostile environment. For purposes of comparison, in *Bowman v. Shawnee State University*, 220 F.3d 456, 464 (6th Cir. 2000), the court found that several incidents of harassment, including shoulder rubbing, grabbing of buttocks, and suggestive comments, were not severe or pervasive. In contrast, in *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008), in which the court held that the plaintiff survived summary judgment on the severe and pervasive aspect of her case, the plaintiff testified that the harasser

> made regular crass and sexual references to her private body parts, requested oral sex in graphic terms, and solicited sex from her on multiple occasions. [She] further asserted that [the harasser] regularly attempted to touch her when they worked on the line, that he rubbed against her with his private parts, and that he tried to grab her waist.

*Id.* at 334. Finally, the Eighth Circuit's summary in a recent case is particularly instructive here:

> Lopez did not want Penning to touch her. He knew that because she asked him to stop, both directly and through Gralund. Yet, Penning touched Lopez almost every time he saw her in the months following. He touched her back, invaded her personal space, and blew on her finger while calling her "baby." And he glared at her for long periods. If true, Penning should be embarrassed and ashamed for how he treated her. Even as we condemn that conduct, we cannot view it as meeting the exacting standard that we must apply in deciding Whirlpool's liability.

*Lopez v. Whirlpool Corp.*, 989 F.3d 656, 663 (8th Cir. 2021) (brackets, quotation marks, and citation omitted). Cronkhite's alleged conduct in this case did not approach Penning's conduct in *Lopez*. Thus, it was not sufficiently severe or pervasive to support a hostile environment claim.

### B. *Monell* Liability

Finally, O'Connor asserts claims for *Monell* liability against the City, arguing that Long is a final decisionmaker under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), and that the City failed to investigate her harassment and retaliation claims. Because O'Connor has failed to show that Defendants Long and Cronkhite violated her constitutional rights, the Court need not address her claims against the City. *See Holsapple v. Cunningham*, 817 F. App'x 95, 107 (6th Cir. 2020) ("Having found no constitutional violation committed by Cunningham, the court need not address whether Cunningham possessed qualified immunity, nor whether Bay County is liable as a municipality under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)."). Accordingly, those claims fail as well.

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment and dismiss O'Connor's complaint **with prejudice**.

A separate order will enter.

Dated: March 14, 2022                          /s/ Sally J. Berens
                                              SALLY J. BERENS
                                              U.S. Magistrate Judge